1  James C. Shah (SBN 260435)
2  Jaclyn M. Reinhart (SBN 317622)
   **SHEPHERD, FINKELMAN, MILLER**
3   **& SHAH, LLP**
4  1230 Columbia Street, Suite 1140
   San Diego, CA 92101
5  Telephone: 619-235 2416
   Facsimile:  866-300-7367
6  Email: jshah@sfmslaw.com
           jreinhart@sfmslaw.com
7
8  *Attorneys for Plaintiff, Individually and as*
   *Representative for the Proposed Class*

9
                **IN THE UNITED STATES DISTRICT COURT**
10
11              **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12  DEPENDABLE HOME REMODELING LLC,      Case No.: **'20 CV0940 JLS  WVG**
    on behalf of itself and all other persons and
13  entities similarly situated,

14              Plaintiff,                **CLASS ACTION COMPLAINT**

15  vs.

16  RENOVATE AMERICA, INC.,

17              Defendant.

18

19       Plaintiff, Dependable Home Remodeling LLC ("Plaintiff"), on behalf of itself and all

20  others similarly situated (collectively, "Class" or "Contractor(s)"), by its undersigned attorneys,

21  brings this Complaint against Defendant, Renovate America, Inc. ("Renovate America" or

22  "Defendant"), for breach of California's Implied Covenant of Good Faith and Fair Dealing and

23  for violation of the California Unfair Competition Law ("UCL").

24                          **PRELIMINARY STATEMENT**

25

26       1.     Property Assessed Clean Energy ("PACE") programs allow governmental bodies,

27  including cities and counties, to offer financing to property owners for energy-efficient property

28
                                    1
                          CLASS ACTION COMPLAINT

improvement projects (e.g., solar panels, window insulation, and air-conditioning units), which they can then pay off over time via special assessments added to their property taxes. A majority of states have passed legislation enabling local governments to use their property collection powers to finance energy-efficient home improvement projects, but California was an early adopter, with the City of Berkeley implementing the first PACE program in 2008. Defendant currently offers PACE financing only in California, Florida, and Missouri.[1]

2.    Typically, governmental entities outsource the financing and administration of these PACE projects to state-certified program administrators ("Program Administrator(s)"), which meet certain statutory qualifications and are overseen by the applicable state agencies. Defendant was, and is, a Program Administrator and is registered as such in the states of California, Florida, and Missouri. The Program Administrators, including Defendant, provide financing for property owners and maintain a roster of thousands of approved Contractors to complete PACE projects. In California, Florida, and Missouri, PACE Program Administrators handle all marketing, loan origination, and run the day-to-day operations of the states' PACE programs. Defendant, providing services through its Home Energy Renovation Opportunity ("HERO") program, is the leading provider of PACE program financing and administrative services in California, Florida and Missouri.

_____

[1] This Complaint focuses on the general requirements in the State of California, but the statutes implementing PACE programs in Florida and Missouri are substantially similar. Moreover, the Participation Agreements (defined in paragraph 3) between Contractors and Defendant at issue in this Complaint have the same language and provision dictating that they are to be construed in accordance with California law, regardless of whether a Contractor is performing the work in California, Florida, or Missouri.

2
CLASS ACTION COMPLAINT

3.      Plaintiff was a registered contractor in the State Florida and was certified to participate in Defendant's HERO program.  Plaintiff brings this action individually and on behalf of the Class (defined below), which is comprised of similarly situated Contractors who entered into Participation Agreements (also referred to as "Agreement(s)") with Defendant for the purpose of receiving payment for projects they have completed on behalf of third-party property owners who finance those projects through a state's PACE program.

4.      The Agreements provide that Defendant will not release payment to Contractors for a PACE-funded project until a third-party property owner certifies that a project has been completed to his or her subjective satisfaction.  Property owners provide confirmation of their personal satisfaction by completing forms called Completion Certificates.  Defendant will not release payment to a Contractor until a property owner returns a Completion Certificate to the Contractor or Defendant, even if the project was fully completed on time and finished in an objectively satisfactory manner.

5.      Unfortunately for Plaintiff and members of the Class, Defendant provides no standards by which third-party property owners must assess completion or determine their satisfaction with a PACE project and, as a result, the Agreements essentially permit property owners to refuse payment even after a Contractor has completed a project in an objectively satisfactory and timely manner.

6.      Of course, this system creates an incentive for abuse and puts Plaintiff and similarly situated Contractors in a difficult position where they are left to simply hope that property owners certify that a project has been completed in accordance with their subjective standards.  This is all the more egregious considering that once a property owner is approved for

3
CLASS ACTION COMPLAINT

PACE financing, Defendant will provide a Contractor with a Notice to Proceed with work on the property, signaling to a Contractor that the financing has been secured and that the Contractor can rely on Defendant for payment.

7.      If a property owner refuses to return the Completion Certificate, Defendant makes no attempt to mediate, resolve the issue, or otherwise ensure that a Contractor is paid for appropriately completed work.  Additionally, Defendant does not provide *any* payment for completed projects in which property owners do not certify their satisfaction.

8.      Indeed, Defendant has minimal incentive to ensure that property owners are not abusing the process.  Defendant is paid for its administrative services when governmental entities issue bonds, creating obligations for the up-front financing provided by Defendant.  Also, Defendant is able to sell the bonds it receives from governmental bodies to issuers who repackage the bonds into securities, which are then purchased by investors (making private investors the ultimate creditors of PACE financing projects).  Defendant is able to generate revenue and more financing opportunities such that it has minimal incentive to work with Contractors to recoup payment for satisfactorily completed projects.  Even though Defendant takes a percentage fee from Contractors for each funded PACE project, a property owner's refusal to submit a Completion Certificate means that the financing is never released and Defendant can simply allocate that money to a future project.  In other words, rather than work to ensure that a property owner signs the Completion Certificate, Defendant can re-allocate the financing to another project, in which it will again take a percentage fee from a Contractor completing the new PACE project.

9.      Moreover, governmental bodies have no incentive to intervene because if financing is never released, there is no obligation to Defendant (as bondholder) for that project, and the governmental entities do not have to spend money recording the financing and collecting the property tax assessments.  The money raised to finance a Contractor's costs for a project can instead simply be used on a different project.  Therefore, by allowing a property owner to refrain from signing the Completion Certificate for any reason, Defendant creates a situation where only the Contractors are harmed, while Defendant and governmental bodies are able to simply move on to the next project.

10.     Plaintiff and members of the Class have suffered serious financial damages because Defendant has breached the covenant of good faith and fair dealing implied in the Agreements by frustrating the Contractors' ability to receive the benefit of the Participation Agreements; namely, payment which was promised by Defendant after approving a property owner for PACE project financing.  Defendant has also breached the implied covenant by failing to exercise good faith in carrying out provisions of the Agreements in that it has, and continues to, refuse to assist Plaintiff and members of the Class in recouping payment from property owners, and never investigates whether property owners are withholding approval of a PACE project for a legitimate reason.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Defendant because it is a corporation registered with the State of California and maintains its headquarters and principal place of business at 16409 West Bernardo Drive, San Diego, California 92127.

5
CLASS ACTION COMPLAINT

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant maintains its headquarters within this judicial district.  Venue is further proper because the wrongdoing alleged herein occurred, in part, in this judicial district.

13.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, since members of the Class are citizens of states different from the state in which Defendant is a citizen and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  *See* 28 U.S.C. § 1332(d).

## PARTIES

14.    Plaintiff is incorporated under the laws of the State of Florida and maintains its headquarters and principal place of business at 5323 Millenia Lakes Boulevard, Suite 300, Orlando, Florida 32839.  Plaintiff was a registered contractor in the State of Florida with all of the proper licensing.  Plaintiff was also registered to work as a Contractor on PACE projects as part of Defendant's HERO program.

15.    Defendant is incorporated under the laws of the State of Delaware and maintains its headquarters and principal place of business at 16409 West Bernardo Drive, San Diego, California 92127.  Renovate America is a registered PACE Program Administrator and finance lender in California, Florida, and Missouri.

## FACTUAL ALLEGATIONS

**I.    BACKGROUND ALLEGATIONS**

**A.    History and Basic Features of PACE Programs**

16.    In 2007, California passed legislation authorizing cities, counties, and other taxing authorities to establish a PACE loan program to encourage residential and commercial property

owners to purchase energy-efficient property improvements, such as solar panels, windows which provide better insulation, and other types of projects.  Florida and Missouri passed similar legislation several years later.  Chapter 29 of Part 3 of Division 7 of the California Streets and Highways Code authorizes a governmental body, statutorily referred to as a "Public Agency," to designate an area within which authorized public officials and property owners may enter into voluntary contractual assessments to finance the installation of renewable, energy-efficient improvements, or water conservation improvements that are permanently fixed to property.[2]  The goal of a PACE program is to increase the amount of financing available to property owners in order to increase accessibility to energy-efficient property improvements.  California, Florida, and Missouri allow both residential and commercial property owners to utilize PACE financing.

17.    A PACE program offers unique financing to property owners that differs from a traditional loan.  Property owners that opt for PACE financing sign an agreement with a local government body, typically a municipality or county, which allows that local government body to collect payments on the PACE loan through property tax assessments over time.  PACE loans have the following unique features: (1) debt for the property improvements attaches to the property and is secured by an assessment recorded as a lien against the property (meaning the obligation passes to subsequent owners); (2) the lien has priority over other debts on the property, including a homeowner's mortgage; and (3) the repayment of the PACE loan is

_____

[2] Florida provides that statutorily defined "Local Governments" have the same power (*see* Fla. Stat. § 163.08(2)(a)); likewise, Missouri gives this power to "Clean Energy Development Boards," comprised of one or more municipalities (*see* Mo. Rev. Stat. § 67.2800(5)).

CLASS ACTION COMPLAINT

collected by the county tax collector via a special assessment payable with the rest of the property owner's property taxes.

18.     Therefore, unlike personal debt, financing provided pursuant to a PACE program is a debt of the property, secured by a lien and transferrable to subsequent owners.

19.     PACE financing, while touted for increasing the number of energy efficient home improvement projects, has also been the subject of much criticism.

20.     Mortgage industry participants, such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), have expressed concerns about local governments encouraging lending to homeowners who cannot obtain conventional financing for ordinary home equity loans, especially because PACE loans are characterized as tax liens that have super-priority over existing secured mortgage(s).  In December 2014, the Federal Housing Finance Agency issued a statement regarding the super-priority of PACE loans, noting that PACE loans may move existing Fannie Mae and Freddie Mac mortgages to a secondary lien position, increasing the risk of loss to the federal government and to taxpayers.

21.     There have also been reports about elderly and low-income property owners being targeted for PACE financing.  This was especially prominent in California prior to October 2017, when Program Administrators like Defendant were not required to even consider property owners' ability to pay when determining whether a property owner qualified for PACE

financing.[3] Now, at least in California, Defendant is directly responsible for making "a reasonable good faith determination that the property owner has a reasonable ability to pay the annual payment obligation for the PACE assessment," beyond simply assessing the owner's equity in the property. Florida and Missouri still do not have statutory requirements to ensure that Program Administrators collect information relevant to a property owner's ability to pay.[4]

22.    There have been numerous lawsuits against Defendant, accusing the company of, *inter alia*, violating consumer protection laws by employing deceptive advertising techniques and misrepresenting the nature of its HERO program. Defendant settled such a suit with the County of Riverside in California in August 2019.[5]

**B.    A PACE Program's Complex Web of Transactions**

23.    Numerous entities and a complex web of transactions are required in order to realize the PACE program's goal of increasing the number of energy-efficient property improvements.

---

[3] Andrew Khouri, *These Loans Were Created to Help Homeowners, But For Some They Did The Opposite*, L.A. TIMES, June 4, 2017, https://www.latimes.com/business/la-fi-pace-loans-20170604-story.html.

[4] Cal. Fin. Code § 22686 provides that Program Administrators must consider a property owner's ability to pay when considering eligibility for financing. Cal. Fin. Code § 22687 provides a list of factors which Program Administrators should consider in evaluating the "ability to pay."

[5] *See District Attorneys Announce $4 Million Consumer Protection Settlement With "PACE" Program Administrator Renovate America, Inc.*, RIVERSIDE COUNTY DISTRICT ATTORNEY NEWS RELEASE, Aug. 9, 2019, https://www.nclc.org/images/pdf/energy_utility_telecom/pace/pr-4_million_consumer_protection_settlement_with_Renovate_America.pdf (explaining that Renovate America reached a $4 million agreement with Riverside County to settle claims arising out of its representations regarding the HERO program).

9
CLASS ACTION COMPLAINT

24.     As demonstrated in the flowchart below, numerous entities are involved in securing PACE financing for property owners, and the flow of transactions can be rather complicated:



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.    <u>Governmental Entities and Program Administrators</u>[6]

25.    Governmental entities, typically municipalities, counties, or bodies created out of some combination thereof, are authorized to raise funds for the purpose of financing PACE projects by issuing bonds or advancing their own funds.  For example, California designates "Public Agencies" as bodies able to raise funding for PACE financing.  Pursuant to California law, Public Agencies include, *inter alia*, "a city, including a charter city, county, city and county, . . . [and] joint powers authority, . . ."[7] Many cities and counties in California choose to align with one of numerous Joint Powers of Authorities ("JPA(s)") in order to implement their PACE programs.  JPAs are administrative structures designed to help local governments achieve economies of scale in certain administrative duties.  Cities or counties have to (1) agree to join the JPA in the first instance and then (2) opt-in to participate in that JPA's PACE program.  JPAs are authorized to issue bonds on behalf of the local governments, and they typically arrange for the administration of PACE programs with Program Administrators, such as Defendant.[8] Cities and counties in Florida and Missouri may similarly align to create separate entities for purposes of carrying out the states' PACE programs.

26.    When Public Agencies raise funds to finance PACE loans, they usually sell all of the bonds to Program Administrators pursuant to a bond purchase agreement, and the Program

--------------------------

[6] Although this section focuses on how the PACE program is implemented in California because it is the most-developed program, the process is largely similar in Florida and Missouri.
[7] Cal Sts. & High. Code § 5902.
[8] Examples of JPAs which implement PACE programs on behalf of cities or counties include the California Statewide Communities Development Authority ("CSCDA"), San Bernardino Council of Governments ("SBCG"), and Western Riverside Council of Governments ("WRCOG").

11
CLASS ACTION COMPLAINT

Administrators then finance and administer PACE projects.  The bonds are secured by assessments on the improvements to the real property.  When property owners begin paying off the initial financing via periodic additional property tax assessments, Public Agencies will then repay the bonds they issued.

27.    Bonds which are used to fund PACE projects can be repackaged and securitized as asset-backed securities, much like mortgage-backed securities.  Defendant, after buying the municipal bonds used to create financing for PACE programs, often facilitates the securitization of the bonds in the secondary bond market.[9] These asset-backed securities are attractive investment options on the open market because repayment of PACE loans is accomplished through property tax assessments and the assessments have super-priority lien status, even taking precedence over mortgages.  Furthermore, securitization of these bonds is enticing because they can be sold to investors as "green" bonds.[10] By providing for the securitization of the bonds purchased from Public Agencies, Defendant is able to free up additional funds to finance more PACE projects.

------

[9] *See The Gold Standard in Green Bonds*, RENOVATE AMERICA (last visited Apr. 24, 2020) https://www.renovateamerica.com/green-bonds; *see also* Adam Tempkin, *First Energy-Efficiency Bonds Sold to Investors*, REUTERS, Mar. 7, 2014, https://www.reuters.com/article/pace-bond-abs-idUSL1N0M41J920140307 (Renovate America became the first entity to sell PACE bonds to issuers in order to be re-packaged as securities and sold to investors).

[10] *See Renovate America Issues First-Ever Green Bonds Securitizing Property Assessed Clean Energy Bonds*, CISION PR NEWSWIRE, Nov. 25, 2015, https://www.prnewswire.com/news-releases/renovate-america-issues-first-ever-green-bonds-securitizing-property-assessed-clean-energy-bonds-300184627.html (securitization of Renovate America's bonds to be sold as "green bonds" for the first time).

CLASS ACTION COMPLAINT

28.    Program Administrators, such as Defendant, are given discretion in how they may implement PACE financing programs, but their broader duties are detailed in agreements entered into with governmental entities.  For example, in California, the WRCOG JPA provides that Renovate America will manage the following administrative tasks:

(1) review and edit all policies relating to commercial and residential projects; (2) provide documentation, processes and procedures required for registering contractors, accepting, processing and approving property owner applications, reviewing eligibility of and approving proposed improvements, providing and tracking all financing disclosures and accepting, processing and approving funding requests, issuing and executing contractual assessment agreements (property owner and issuer), recording or causing to be recorded lien documents, issuing and executing Bond documents, and instructing the bond trustee when to issue payment for funding requests, including HERO Program Guidelines, Eligible Improvement Lists, contractor registration/approval forms, commercial applications, all financing disclosure forms, all forms required to approve improvements, funding request form(s), and contractual assessment agreement and lien recordation documents (unless provided by municipality); (3) design and build the HERO Commercial Program's website; (4) integration of Renovate America's origination systems with the HERO Commercial Programs website.

29.    Additionally, Renovate America is tasked with providing origination services, including:

As part of Program Administration Services, Renovate America shall provide origination services which include: (1) process all applications, including accepting applications (online and hard copy), entering hard copy applications into online system, pulling all credit, title, valuation and other reports, reviewing eligibility of proposed property, applicants, equipment and contractors, tracking all financing disclosures, application and authorization forms, contacting applicants, contractors and other parties as needed, providing notifications of approval, denial or incomplete status; (2) obtaining or assisting property owners to obtain consent of the first mortgage holder, if any; (3) process all funding requests for Residential parcels participating in the HERO Programs, including

13
CLASS ACTION COMPLAINT

accepting funding request forms, reviewing submitted forms and attachments, providing notification of funding request approval, denial or incomplete status; (4) process and finalize all contractual assessment documentation, including issuance of contractual assessment and financing disclosures; (4) provide telephone and email customer service support; (5) track and report to WRCOG key HERO Programs statistics, including applications received, approved, assessment contracts issued and signed; (6) periodically assess and/or adjust policies and procedures of the HERO Programs as needed to resolve any recurring issues.

30.    Although property owners pay for the financing of PACE improvements through property tax assessments collected by local governments, Program Administrators such as Defendant implement the entire program and take care of all administration, marketing, and financing duties.  In exchange for administering PACE programs, Defendant receives a one-time assessment administrative fee, which is a percentage of the cost of each project.  For example, in February 2018, WRCOG agreed to pay Renovate America roughly 5.17% of the cost of each project for administrative services, which is paid out of proceeds from bond issuances undertaken by a governmental entity. Even though this percentage fee is paid from bond proceeds, the local government eventually passes this fee on to the property owner via the Assessment Contract between the local government and the property owner.

2.    Property Owners and Governmental Entities

31.    As discussed, PACE financing is different from a normal loan because the initial financing is paid off over time by property owners through special assessments on their property taxes.  In order to receive PACE funding, property owners must enter Assessment Contracts with local government bodies, whereby they agree to make semi-annual payments in addition to their normal property tax payments. Assessment Contracts explain the annual payment due, including

14
CLASS ACTION COMPLAINT

interest, the number of years it will take for a property owner to completely pay for the PACE financing, and other information which property owners must know.

32.     While the Assessment Contract is formally between a local government entity and property owner, Program Administrators like Defendant completely manage the process. Defendant provides and reviews applications from property owners, determines property owners' eligibility, ensures the execution of the Assessment Contract, and pays Contractors for completing PACE-sponsored projects.

33.     Nonetheless, state laws often provide minimum requirements which property owners and projects must satisfy in order to be approved for PACE financing.  For example, to receive financing for a PACE project pursuant to California law, a property owner must satisfy the following requirements:

a.     A property owner who receives financing must be the legal owner of the underlying property to be improved (Cal. Pub. Res. Code § 26063(a)(1));

b.     The property owner must be current on his or her mortgage and property tax payments and must not have had more than one late payment during the six months preceding the application date (Cal Fin. Code § 22684(a));

c.     The property owner must not be in default or in bankruptcy proceedings (Cal. Fin. Code § 26063(a)(3));

d.     PACE financing must be for less than 15 percent of the value of the property, up to the first $700,000 of the value of the property (Cal Fin. Code § 22684(h); Cal. Fin. Code § 26063(a)(4));

e.     The property must be within the geographical boundaries of the PACE program (Cal Fin. Code § 22684(f); Cal. Fin. Code § 26063(a)(5));

f.     The total mortgage-related debt on the property must not exceed 97 percent of the market value of the property (Cal Pub. Res. § 26063; Cal Fin. Code § 22684(i)); and

15
CLASS ACTION COMPLAINT

g.  A property owner's participation may not result in the total amount of property taxes and assessments exceeding 5 percent of the property's market value, as determined at the time of approval of the property owner's contractual assessment (Cal. Str. & Hwy § 5898.16).

34.  California state law further requires that Program Administrators may not execute an Assessment Contract with a property owner on behalf of a local government unless the following criterion, in addition to the above, are satisfied:[11]

a.  The Program Administrator must ask and ensure that there has been no more than one late payment of property taxes on the property for the previous three years or since the current owner acquired the property;

b.  The property that will be subject to the assessment contract has no recorded and outstanding involuntary liens in excess of $1,000;

c.  The property that will be subject to the assessment contract has no notices of default currently recorded that have not been rescinded; and

d.  The property owner has not been a party to any bankruptcy proceedings within the last four years . . . and the property owner has had no payments more than 30 days past due on any mortgage debt or nonmortgage debt, excluding medical debt, during the 12 months immediately preceding the application date.

35.  Again, even though property owners pay local governments for up-front PACE financing through special tax assessments, a Program Administrator, such as Defendant, is responsible for managing the entirety of the program and verifying the above information using "commercially reasonable and available methods."[12]

36.  As mentioned, property owners pay an administrative fee as a part of any PACE project, but, in addition, property owners are required to pay a $75.00 fee to cover the cost of

---

[11] Cal Fin. Code § 22684.
[12] Cal Fin Code §§ 22684 & 22686.

recording the assessment; a further administration fee of $180.00; an annual assessment

administration fee of $50.00; and any interest which accrues prior to a property owner's first

payment.

## II.     PARTICIPATION AGREEMENTS BETWEEN RENOVATE AMERICA AND CONTRACTORS

37.     At issue in this Complaint are the relationships between Defendant and

Contractors, which are governed by Participation Agreements (and any supplements thereto).

38.     As part of Defendant's administration of PACE loan programs, it maintains

rosters of thousands of local Contractors approved to complete energy-efficient PACE projects.

These Contractors must be vetted and approved in accordance with state law and Defendant's

requirements.  Participating Contractors, such as Plaintiff, must be licensed and bonded by the

necessary state authority and must also be registered with Renovate America to participate in its

PACE loan program.

39.     Contractors, in order to receive financing as payment for PACE projects, must

enter into Participation Agreements with Program Administrators.[13] The Agreements are

thorough and provide a laundry list of requirements and various terms and conditions which

Contractors must satisfy in order to participate.  Program Administrators also provide

Contractors with marketing material and information about potential customers.  Indeed,

---

[13] The Participation Agreement between Plaintiff and Defendant, and Supplements thereto, are
attached hereto as Exhibits 1 (Participation Agreement), 1-1 (Contractor Excellence Program
Agreement), and 1-2 (HERO Contractor Fee Program Agreement).

CLASS ACTION COMPLAINT

Contractors often market Defendant's PACE financing option and Contractors'

recommendations are responsible for the origination of a large portion of PACE loans.

40.    Additionally, the Agreements and/or supplements thereto, provide Contractors

with a rate schedule. For example, for all projects administered and financed by Defendant as of

August 17, 2017, Plaintiff would pay between 1.99% and 12.99% in Contractor Fees to

Defendant, depending on the Rate Plan for which Plaintiff qualified.[14] Defendant maintains

complete discretion over whether a Contractor qualifies for a particular rate plan.  Notably, as the

middleman, Renovate America is able to earn administrative fees from local governments when

they issue bonds and then receives further revenue by charging Contractors fees on a per-project

basis.

41.    As part of Defendant's terms and conditions accompanying Participation

Agreements, Plaintiff and Contractors were and are required to maintain separate property

improvement contracts with property owners who are the recipients of PACE funds from

Program Administrators.[15] This generic property improvement contract provides the scope of

work to be completed and the costs of the project.

**A.    Defendant Makes Payment to Contractors Contingent on Subjective Approval of Property Owners and Does Not Assist in Securing Approval of Completed Projects**

42.    In the Participation Agreement between Contractors and Defendant, a Contractor

is required to present a property owner with a Completion Certificate, which the property owner

---

[14] *See* Exhibit 1-2.
[15] *See* Exhibit 1, at 1.9.1.12, 2.1.3.

CLASS ACTION COMPLAINT

must sign after a Contractor completes a project in order for Defendant to release payment to a contractor.[16] Specifically, and regardless of the language in the contract which Contractors execute with property owners, Defendant requires that they "[p]resent the Completion Certificate for signature to the Property Owner only after completion" of a PACE-funded project.[17] Plaintiff and similarly situated Contractors only receive money from Defendant after a property owner completes a Completion Certificate stating that they are completely satisfied with the work done.

43.    Defendant, however, does not provide any standards in the Participation Agreement (or supplements thereto) or in the actual Completion Certificates by which property owners must assess their satisfaction.  Also, no standards are provided in the financing application or agreement which property owners sign with the applicable local government.  The Completion Certificate, the finalization of which is critical in ensuring a Contractor is paid, provides that property owners must attest that "[t]he products identified in the Installed HERO Product Details have been installed at the address listed above and ***the installation of such products has been completed to my satisfaction***, and to the satisfaction of all other property owners . . .") (emphasis added).  Basically, this system gives property owners unfettered discretion to determine whether or not they want to pay for a satisfactorily completed project.[18]

44.    Defendant recognizes that this is a product of its contracting and actually promotes it on its website.  In a marketing video on Defendant's website, the narrator proclaims

_____

[16] Exhibit 1, at 1.9.1.7; *see also* Exhibit 2 (Completion Certificate).
[17] Exhibit 1, at 1.9.1.7.
[18] *See* Exhibit 2, at p. 3.

CLASS ACTION COMPLAINT

that property owners only have to pay when they sign off on a project, signaling that it has been "completed to your satisfaction.  In other words, you're the boss."[19]

45.    Defendant does not and will not assist Contractors to ensure that property owners are not simply avoiding responsibility for payment.  Defendant does not review contractor work and actually maintains the position that any dispute regarding the property owner's failure to sign the Completion Certificate becomes a dispute between the Contractor and property owner. Moreover, Defendant provides no mechanism for Plaintiff and Contractors to ensure that they are paid for completed work when a property owner refuses to complete a Completion Certificate.

46.    Upon information and belief, Defendant's position is that a property owner can cancel before a project is funded whether a Contractor has not started work, started work but not finished, or finished but the property owner has not signed the Completion Certificate.[20] In the situation where a property owner cancels funding and refuses to sign the Completion Certificate when a Contractor has already begun or has even finished work, Defendant washes its hands of the ordeal and directs Contractors to hold property owners liable for breach of the separate home improvement contract, which Defendant makes Contractors enter into pursuant to the Participation Agreement.[21]

---

[19] *Watch to See How HERO Financing Works*, (last visited Apr. 24, 2020), https://www.renovateamerica.com/financing/hero.

[20] State law requires that property owners be given a right to cancel funding, but only mandates that property owners be given the Right to Cancel within three days of receiving the Assessment Contract or the statutorily-mandated financing disclosure (Cal. Str. & Hwy. § 5898.16), but both of these documents are signed before Defendant issues the Notice to Proceed with work.

[21] Exhibit 1, at 1.9.1.12.

20
CLASS ACTION COMPLAINT

47.     Further demonstrating the egregious nature of the Participation Agreements, Defendant specifically provides Plaintiff and similarly situated Contractors with Notices to Proceed with work.  The Notice to Proceed is issued immediately after a property owner has countersigned financing disclosure documents and an Assessment Contract.[22]  The Notice to Proceed tells Contractors how long they have to complete a project and submit a Completion Certificate signed by a property owner.  The Notice to Proceed essentially signals to Contractors that financing has been approved and will be disbursed by Defendant upon completion of the project.

48.     Defendant impedes Contractors' ability to earn the benefit of their bargain under the Participation Agreements by (1) issuing Notices to Proceed to Contractors who begin and complete projects with reliance upon Defendant's certification that financing will be released upon completion of the work; (2) allowing property owners to subjectively refuse satisfaction with a project even when it was completed in an objectively satisfactory manner; and (3) refusing to assist Contractors in getting property owners to approve finished projects completed with satisfactory workmanship.

49.     Plaintiff and members of the Class have performed work for property owners in reliance on Defendant's Notices to Proceed and representations that financing has been approved for a given project.  Defendant, however, has not operated in good faith.

------

[22] *See* Exhibit 3 (HERO program Notice to Proceed).

21
CLASS ACTION COMPLAINT

**B.    Elderly and Low-Income Neighborhoods Are Targeted for PACE Financing Projects, Exacerbating the Effect of Defendant's Actions**

50.    Making the subjective satisfaction clause all the more problematic for Contractors is the fact that PACE loan programs, including Defendant's HERO loan program, are designed to give low- and middle-income homeowners, who potentially could not obtain conventional financing for traditional home improvement loans, the ability to make energy-efficient home improvements through the HERO PACE loans.

51.    The total number of originated PACE loans has rapidly grown in recent years.  As of 2019, over 200,000 homeowners nationwide have secured over $5 billion in financing to pay for energy efficient property improvement projects.

52.    With this rapid growth, the federal government has considered additional regulations, noting that "PACE home improvements for many homeowners, especially low and moderate-income families, are far from affordable, and homeowners lack proper disclosures that reflect the true cost of the improvements."[23]  When Cisco DeVries (founder and former CEO of another PACE financing company) established the first PACE program while working for the City of Berkeley in California, he noted that PACE "democratized clean energy" by permitting property owners without a lot of cash and imperfect credit to nonetheless finance home improvement projects.[24] It was not until October 2017 that California implemented legislation

_____

[23] Letter from United States Senators Catherine Cortez Masto and Tom Cotton to Director of the Federal Consumer Financial Protection Bureau, Kathy Kraninger, Feb. 17, 2019, https://www.cortezmasto.senate.gov/imo/media/doc/Cortez%20Masto%20Cotton%20Letter%20to%20CFPB%20re%20PACE.pdf?mod=article_inline.
[24] *See* Khouri, *supra* note 3.

22
CLASS ACTION COMPLAINT

requiring that financing companies, like Defendant, check income and other debt obligations of property owners.[25] Prior to 2017, eligibility was largely based on home equity, making elderly citizens perfect targets.  Florida and Missouri have yet to implement similar legislative protections.

53.     That PACE programs were created to provide funding for property owners who may not have been able to obtain traditional financing further demonstrates that Defendant's actions constitute a violation of the implied covenant of good faith and fair dealing.  By making payment to Contractors contingent upon property owners' subjective satisfaction, especially when a large portion of those property owners accepted PACE financing when they may have not qualified for traditional financing, Defendant is setting up the Contractors for failure and leaving them with little recourse.  By failing to assist in ensuring property owners sign off on satisfactorily completed projects, Defendant is preventing Contractors from realizing the benefit of Participation Agreements.

### III.     PLAINTIFF'S PARTICIPATION IN DEFENDANT'S HERO PROGRAM

54.     Plaintiff signed its Participation Agreement and became a participant in Defendant's HERO program on March 19, 2018.[26]  Additionally, Plaintiff signed the supplemental HERO Contractor Excellence Program Agreement on May 17, 2018, which provides additional terms and conditions for Plaintiff to satisfy in order to participate in

---

[25] Andrew Khouri, *After Booming for Years, A Controversial Home Improvement Loan is on the Decline*, Dec. 21, 2018, https://www.latimes.com/business/la-fi-pace-decline-20181221-story.html.
[26] *See* Exhibit 1.

23
CLASS ACTION COMPLAINT

Defendant's HERO program.[27]  Furthermore, on June 12, 2018, Plaintiff signed the HERO

Contractor Fee Program Agreement, which provided the fee which a Contractor must pay to

Defendant upon release of projects' funds.[28]

55.     Plaintiff completed many PACE projects for property owners in Florida, which

were to be financed by Defendant through its HERO program.  Below are just a few examples of

HERO-financed projects which Plaintiff completed in an objective satisfactory manner, but

property owners failed to sign the necessary Completion Certificates:

56.     On July 29, 2018, Plaintiff entered into a home improvement contract with a

property owner located in in Boynton Beach, Florida.  The project involved the installation of ten

(10) hurricane impact windows and seven (7) hurricane impact doors.  The total cost of the

project was $37,812, and it was to be financed by Defendant.  Defendant approved the

homeowner for financing and thereafter issued Plaintiff a Notice to Proceed with the work.

Plaintiff completed the project on March 26, 2019 in an objectively satisfactory manner, but the

homeowner did not sign the Completion Certificate.  Defendant did not release the financing or

assist Plaintiff in securing the homeowner's approval of the project via a signed Completion

Certificate.  Plaintiff has still not received payment for this project.

57.     On June 21, 2018, Plaintiff entered into a home improvement contract with a

property owner located in Cooper City, Florida.  The project involved the installation of eleven

(11) hurricane impact windows and three (3) sliding hurricane impact doors.  The total cost of

---

[27] Exhibit 1-1.
[28] Exhibit 1-2.

24
CLASS ACTION COMPLAINT

the project was $31,000, and it was to be financed by Defendant. Defendant approved the homeowner for financing and thereafter issued Plaintiff a Notice to Proceed with the work. Plaintiff completed the project on April 8, 2019 in an objectively satisfactory manner, but the homeowner did not sign the Completion Certificate. Defendant did not release the financing or assist Plaintiff in securing the homeowner's approval of the project via a signed Completion Certificate. Plaintiff has still not received payment for this project.

58.    On June 22, 2018, Plaintiff entered into a home improvement contract with property owners located in Hallandale Beach, Florida. The project involved the installation of eleven (11) hurricane impact windows, one (1) sliding hurricane impact door, and 2,600 square feet of new roofing. The total cost of the project was $37,000, and it was to be financed by Defendant. Defendant approved the homeowner for financing and issued Plaintiff a Notice to Proceed with the work on June 26, 2018. Plaintiff completed the project in August 2018 in an objectively satisfactory manner, but the homeowners did not sign the Completion Certificate. Defendant did not release the financing or assist Plaintiff in securing the homeowner's approval of the project via a signed Completion Certificate. Plaintiff has still not received payment for this project.

59.    As demonstrated by the foregoing examples, Plaintiff has consistently had difficulty getting property owners to sign the necessary Completion Certificate after completing a PACE project which was to be financed through Defendant's HERO program.

60.    Many property owners have failed to give approval of Plaintiff's completed projects via a signed Completion Certificate despite the fact that Plaintiff completed its PACE projects in a timely and objectively satisfactory manner.

CLASS ACTION COMPLAINT

61.    Plaintiff sought Defendant's assistance in securing property owners' approval when they refused to sign the Completion Certificate on timely completed projects, but Defendant systematically refused to assist Plaintiff and instead directed it to seek recourse through the home improvement contract between Plaintiff and property owner.

62.    Pursuant to Defendant's practices in administering and carrying out its HERO program, Defendant has caused Plaintiff to partially or fully complete PACE projects without receiving any payment for its work. Plaintiff has suffered hundreds of thousands of dollars in damages due to property owners failing to sign Completion Certificates for projects completed in an objectively satisfactory manner and Defendant's failure to intervene. Moreover, Plaintiff wasted its time completing PACE projects financed by Defendant instead of allocating its time and resources to other projects.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) as a class action on behalf of itself and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiff seeks certification of the following Class:

> All persons and entities who entered into Participation Agreements with Defendant to participate in its HERO Program and completed projects for which financing was not released.

64.    Plaintiff seeks to certify the above-defined Class to bring claims against Defendant pursuant to California law. A multi-state class action is appropriate because the terms and conditions in the Participation Agreements provide that all Agreements, no matter where PACE contracting projects are completed, are governed by California substantive law.

26
CLASS ACTION COMPLAINT

65.     Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from the Class are any judicial officers presiding over this matter, members of their immediate family, members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered.

66.     Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

67.     **Risk of Inconsistent or Varying Adjudications.  Fed. R. Civ. P. 23(b)(1).**  As the proposed Class includes thousands of Contractors whom Defendant approved to work on PACE projects pursuant to the terms of uniform Participation Agreements, there is significant risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendant.  For example, declaratory relief may be entered in multiple cases, but the ordered relief may vary, causing Defendant to have to choose the court order with which it will comply.

68.     **Numerosity.  Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members of the Class are so numerous that the joinder of all members is impractical.  While the exact number of members in the Class is unknown to Plaintiff at this time, it is believed that the Class is comprised of hundreds or thousands of Contractors dispersed throughout the states of California, Florida, and Missouri.  Affected Contractors' names and addresses are available from Defendant's records, and members of the Class may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

69.    **Predominance of Common Issues.  Fed. R. Civ. P. 23(a)(2) and (b)(3).**
Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action
involves common questions of law and fact that predominate over any questions affecting
individual members of the Class.  The common questions include:

    a.    Whether Defendant's conduct breaches the covenant of good faith and fair
dealing implied into the Participation Agreements between Defendant and Contractors;

    b.    Whether Defendant's conduct constitutes a violation of the UCL;

    c.    Whether Plaintiff and Contractors are entitled to damages, costs, or
attorneys' fees from Defendant;

    d.    Whether Plaintiff and Contractors are entitled to compensatory damages;
and

    e.    Whether Plaintiff and Contractors are entitled to declaratory relief.

70.    **Typicality.  Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of other
Contractors' claims because Plaintiff and members of the Class have been subjected to the same
unlawful conduct and damaged in the same way.  Defendant's conduct that has given rise to the
claims of Plaintiff and other Contractors (i.e., permitting property owners to cancel funding after
Contractors have completed satisfactory work and refusing to assist Contractors in receiving the
approval of PACE projects) is the same for all members of the Class.

71.    **Adequacy.  Fed. R. Civ. P. 23(a)(4).**  Consistent with Rule 23(a)(4), Plaintiff is
an adequate representative of the Class because Plaintiff is a member of the Class and is
committed to pursuing this matter against Defendant to obtain relief for all of the Contractors.
Plaintiff has no conflicts of interest with the Class and signed a Participation Agreement that was

largely similar to the one signed by all members of the Class.  Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in litigating consumer claims.  Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

72.    **Superiority.  Fed. R. Civ. P. 23(b)(3).**  Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation.  Here, the damages suffered by Plaintiff and the Contractors are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable.  Individual litigation by each member of the Class would also strain the court system.  Moreover, individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

73.    **Declaratory Relief.**  Class certification is also appropriate under Rule 23(b)(2) and (c).  Defendant, through its uniform Participation Agreements with Contractors, acted or refused to act on grounds generally applicable to the Class, making uniform injunctive and declaratory relief appropriate to the Class.  Moreover, Defendant continues to maintain its

Participation Agreements which contain unfair and subjective property owner satisfaction clauses, thus making declaratory relief a live issue and appropriate to the Class as a whole.

## FIRST CAUSE OF ACTION
### (Breach of California's Implied Covenant of Good Faith and Fair Dealing)
### On Behalf of the Class

74.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

75.     Between Defendant and Plaintiff and all similarly situated Contractors there existed valid and enforceable contracts, the Participation Agreements.  A true and correct copy of Plaintiff's Participation Agreement with Defendant is attached hereto as Exhibit 1.  The essence of the Participation Agreements is for Defendant to maintain a roster of approved Contractors, which abide by Defendant's terms and conditions, for the purpose of completing PACE projects. By agreeing to participate in the program (and pay the per-project fees to Defendant), Contractors are supposed to receive a reliable source of financing for the completion of energy-efficient property improvement projects.

76.     The covenant of good faith and fair dealing is implied by law into every contract entered into in the State of California and functions as a supplement to express contractual terms, preventing frustration of a party's rights to the benefits of the contract.

77.     Under California law, a party breaches the implied covenant of good faith and fair dealing if it exercises its rights in a manner that evades the spirit of the agreement and denies the other party the expected benefit of the agreement

78.     Defendant breached California's implied covenant of good faith and fair dealing by (1) issuing Notices to Proceed to Contractors who begin and complete projects with reliance

upon Defendant's certification that financing will be released upon completion of the work; (2) allowing property owners to subjectively refuse satisfaction with a project even when it was completed in an objectively satisfactory manner; and (3) refusing to assist Contractors in getting property owners to approve finished projects completed with satisfactory workmanship.

79.    Under the Participation Agreement, Defendant agrees to provide compensation to Contractors who complete PACE projects in accordance with its terms and conditions. Defendant frustrates Plaintiff's ability to receive the benefit of the bargain when Defendant leaves Contractors' receipt of the benefit completely in the hands of the subjective whims of property owners.

80.    Moreover, Defendant did not exercise good faith in ensuring that property owners exercised their discretion in a reasonable manner calculated to ensure that Contractors would receive the benefit promised them under the Participation Agreement.  In fact, the opposite is true.  When Contractors had difficulty getting property owners to sign Completion Certificates, Defendant would direct Contractors to seek recompense pursuant to the separate improvement contracts, which Defendant required Contractors to enter into with property owners.

81.    As a proximate result of Defendant's conduct, Plaintiff and similarly situated Contractors have suffered great financial damages, with the exact amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Violation of the UCL (Unfair Business Practice), Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**
**On Behalf of the Class**

82.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

31
CLASS ACTION COMPLAINT

83.     The UCL prohibits unfair competition and unfair, unlawful, or fraudulent business practices.

84.     Plaintiff and Defendant are each "person(s)" within the meaning of California's UCL (Cal. Bus. & Prof. Code §§ 17200, *et seq.*).

85.     Cal. Bus & Prof. Code § 17204 authorizes a private right of action on both an individual and a representative basis and confers standing to prosecute actions for relief not only on certain public enforcement officials, but on "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."

86.     By failing to operate in good faith and preventing Contractors from receiving the benefit of their bargain in certain instances as described in the foregoing allegations, Defendant has engaged in unfair business practices.

87.     Plaintiff seeks all available damages and injunctive relief requiring Defendant to alter its contracting practices with regard to the Participation Agreements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment as follows:

      a.     Certification of the proposed Class;

      b.     Appointment of Plaintiff as representative of the Class, and Plaintiff's counsel as counsel of the proposed Class;

      c.     Compensatory and consequential damages identified herein, to be proven at trial;

CLASS ACTION COMPLAINT

d.    Injunctive relief forcing Defendant to alter the language in the

Participation Agreements and refrain from permitting property owners to

deny approval for any subjective reason;

e.    Pre- and post-judgment interest;

f.    Punitive and exemplary damages;

g.    Disgorgement of profits; and

h.    For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action so triable.

DATED: May 20, 2020

**SHEPHERD FINKELMAN MILLER & SHAH, LLP**

*/s/ James C. Shah*
James C. Shah (SBN 260435)
Jaclyn M. Reinhart (SBN 317622)
1230 Columbia Street, Suite 1140
San Diego, CA 92101
Telephone: 619-235 2416
Facsimile: 866-300-7367
Email: jshah@sfmslaw.com
            jreinhart@sfmslaw.com

Michael P. Ols (to be admitted *pro hac vice*)
**SHEPHERD FINKELMAN MILLER & SHAH, LLP**
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: mols@sfmslaw.com

*Attorneys for Plaintiff, Individually and as Representative for the Proposed Class*

33
CLASS ACTION COMPLAINT